*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0450**

Joel Inskeep and Chelsea Inskeep
and o/b/o L.I. and E.I., petitioners,
Respondents,

vs.

Sheila Moore,
Appellant,

Harry Walk,
Appellant.

**Filed March 28, 2016
Affirmed
Schellhas, Judge**

Goodhue County District Court
File No. 25-CV-14-2581

Lance T. Bonner, Lindquist & Vennum LLP, Minneapolis, Minnesota (for respondents)

Sheila Moore, McGregor, Iowa (pro se appellant)

Harry Walk, McGregor, Iowa (pro se appellant)

        Considered and decided by Worke, Presiding Judge; Schellhas, Judge; and Johnson, Judge.

UNPUBLISHED OPINION

**SCHELLHAS**, Judge

Appellants challenge the grant of a harassment restraining order, arguing that several of the district court's factual findings are clearly erroneous. We affirm.

## FACTS

On November 7, 2014, respondent Joel Inskeep sought a harassment restraining order (HRO) in Goodhue County District Court on behalf of himself; his wife, respondent Chelsea Inskeep; and their minor children, L.I. and E.I., against appellants Sheila Moore and Harry Walk. Moore is Chelsea Inskeep's mother, and Walk is Moore's husband. The same day, the court issued an ex parte HRO against Moore and Walk. Moore and Walk requested a hearing, and the court conducted a hearing on or about December 15, 2014. Moore and Walk attended the hearing with counsel; Inskeeps appeared pro se.

At the HRO hearing, Inskeeps testified that, on several occasions, Moore and Walk made uninvited visits to Inskeeps' home and the children's school and bus stop and that Inskeeps repeatedly had informed Moore and Walk that they did not want contact with Moore and Walk.[1] On December 15, 2014, the district court issued a two-year HRO

---

[1] In their principal brief, Moore and Walk reference a number of facts relating to their relationship with Inskeeps for which no evidence was produced at the HRO hearing. And in the addenda to their principal and reply briefs, Moore and Walk include a number of documents, including photographs of text messages between Moore and Chelsea Inskeep, that were not presented to the district court and are not part of the record before us. We do not consider these facts or documents. *See* Minn. R. Civ. App. P. 110.01 ("The documents filed in the trial court, the exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases."); *Thiele v. Stich*, 425 N.W.2d 580, 582–83 (Minn. 1988) ("An appellate court may not base its decision on matters outside the record on appeal, and may not consider matters not produced and received in evidence below.").

prohibiting Moore and Walk from harassing or having direct or indirect contact with Inskeeps and the children or from being within 500 feet of Inskeeps' home, Joel Inskeep's workplace, and the children's school.

By letter dated January 22, 2015, Moore and Walk requested permission to move for reconsideration of the HRO. They argued that a number of the district court's findings conflicted with testimonial evidence given by Inskeeps at the HRO hearing. Moore and Walk also argued that they received "ineffective assistance of counsel in the case" and that Moore was "quite ill" on the day of the hearing and therefore inadvertently left important physical evidence at home. The court denied the request.

This appeal follows.

**D E C I S I O N**

"An appellate court reviews a district court's grant of a harassment restraining order under an abuse-of-discretion standard." *Kush v. Mathison*, 683 N.W.2d 841, 843 (Minn. App. 2004), *review denied* (Minn. Sept. 29, 2004). "A district court's findings of fact will not be set aside unless clearly erroneous, and due regard is given to the district court's opportunity to judge the credibility of witnesses." *Id.* at 843–44 (citing Minn. R. Civ. P. 52.01). "Findings of fact are clearly erroneous only if the reviewing court is left with the definite and firm conviction that a mistake has been made." *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999) (quotation omitted). "[T]his court will reverse the issuance of a restraining order if it is not supported by sufficient evidence." *Kush*, 683 N.W.2d at 844.

3

A person who is a victim of harassment, or a parent of a minor who is a victim of harassment, may seek a restraining order from the district court. Minn. Stat. § 609.748, subd. 2 (2014). If "the court finds . . . that there are reasonable grounds to believe that the respondent has engaged in harassment," it may issue a restraining order that "orders the respondent to cease or avoid the harassment of another person" or "orders the respondent to have no contact with another person." *Id.*, subds. 5(a), 5(b)(3) (2014). "Harassment" includes "repeated incidents of intrusive or unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial adverse effect on the safety, security, or privacy of another, regardless of the relationship between the actor and the intended target," as well as "a pattern of attending public events after being notified that the actor's presence at the event is harassing to another." *Id.*, subd. 1(a) (2014) (quotation marks omitted).

In their pro se principal brief, Moore and Walk appear to argue that a number of the district court's findings of fact are unsupported by the evidence and that the court therefore abused its discretion by issuing the HRO. The court found that Moore and Walk "followed, pursued or stalked [Inskeeps]" because "[Inskeeps] made it quite clear to [Moore and Walk] that they were to stay away from [Inskeeps'] residence, school [and] bus stop. [Moore and Walk] did not comply on numerous occasions." Moore and Walk argue that they were unaware that their grandchildren rode the school bus and that they "pulled over briefly" because they saw Joel Inskeep standing on a corner. They further argue that "there is no evidence indicating [they] were ever informed that [they] were to stay away from the school or bus stop" and that the court's finding was "pure speculation."

The district court also found that Moore and Walk "made uninvited visits to [Inskeeps]" by "us[ing] drop off of [Inskeeps'] personal property as [a] purported reason to park at residence repeatedly in hopes of seeing grandchildren—all uninvited and in violation of [Inskeeps'] directives to stay away [and] respect [the] family's privacy." Moore and Walk argue that they "never 'visited'" Inskeeps—rather, they "*delivered*" Chelsea Inskeep's and the children's belongings. Moore and Walk also argue that "there was no evidence adduced that [they] 'repeatedly' parked at the Inskeep residence 'in hopes of seeing the children,' which is speculative."

In addition, the district court found that Moore and Walk "attended public events after being notified that [their] presence at the events is harassing to [Inskeeps]." The court noted incidents that occurred at the children's school and found that "school authorities met with [Moore and Walk] and explained to them that [Inskeeps] did not want them there to see grandchildren." Moore and Walk argue that they "were never notified that attending public events was harassing to [Inskeeps]" and that "there was only one instance of [Moore and Walk] attending an event that [their] grandsons participated in."

Finally, the district court found that "[t]he harassment . . . [wa]s intended to have a substantial adverse effect on [Inskeeps'] safety, security, or privacy." The court noted:

> It is unfortunate that [Moore and Walk] are not enjoying the usual grandparent/grandchildren relationship, but [Inskeeps'] directives were clear [and] often repeated. [Moore and Walk] intentionally attempted to thwart those requests [and] directives of [Inskeeps]—as evidenced by all the circumstances [and] testimony of [Inskeeps].

5

Moore and Walk argue that the court "only considered the testimony of [Inskeeps] and g[ave] no weight to [their] testimony." Moore and Walk assert that they "wanted to deliver items and wanted to show love and support" to the children.

But "[c]redibility determinations are the province of the trier of fact." *Peterson v. Johnson*, 755 N.W.2d 758, 763 (Minn. App. 2008). And appellate courts must give "due regard . . . to the district court's opportunity to judge the credibility of witnesses." *Kush*, 683 N.W.2d at 843–44 (citing Minn. R. Civ. P. 52.01). The district court apparently found Inskeeps' testimony to be more credible than that offered by Moore and Walk, and we defer to that determination. *See Brennan v. Joseph G. Brennan, M.D., P.A.*, 425 N.W.2d 837, 839–40 (Minn. 1988) (noting district court's implicit finding that testimony of witness lacked credibility and stating that "[a]ssessment of witness' credibility is the unique function of the trier of fact").

Contrary to Moore and Walk's contentions, the district court's findings are supported by evidence in the record. In June 2013, Moore and Walk went to Inskeeps' home with a toy truck belonging to the children. Moore and Walk "sat knocking on the door and . . . wouldn't leave." Joel Inskeep asked Moore and Walk to leave, informing them, "'We don't want to have any contact with you at this time.'" When Moore and Walk did not leave, Joel Inskeep called the police. In June 2014, Moore and Walk parked their car in front of Inskeeps' house for about four hours; wrote on the windshield of their car, "'Mema loves [L.I.] and [E.I.]'";[2] and left Chelsea Inskeep's belongings on the lawn. In

---

[2] "Mema" is L.I. and E.I.'s nickname for Moore.

6

August 2014, Moore and Walk returned to Inskeeps' house with a desk and chair that belonged to Chelsea Inskeep. They went for a short bike ride, unloaded the furniture, and left without speaking to anyone. Inskeeps did not ask Moore and Walk to return the items and "had already informed [Moore and Walk], several times, that [Inskeeps] did not want [Moore and Walk] at [Inskeeps'] residence, and that . . . [Moore and Walk] weren't welcome."

Moreover, Moore and Walk testified that they went to the children's school to attend a concert in the spring of 2014. Moore admitted that, when she and Walk checked in at the school office, the school "told [them] that [they] weren't allowed there." The school's principal informed Moore and Walk that Joel Inskeep had directed the school to call him if Moore and Walk attempted to come inside the school. In October 2014, Moore and Walk nevertheless attended a Halloween parade outside the children's school. Moore and Walk both testified that they attended the parade and greeted the children. Moore admitted that she took a picture with E.I. A week after the Halloween parade, Moore and Walk parked their car by the children's bus stop when they saw Joel Inskeep standing on a street corner.

Each visit required Moore and Walk to travel about 150 miles from their home in McGregor, Iowa, to Inskeeps' home in Red Wing, Minnesota. Joel Inskeep testified that the visits from Moore and Walk are "very stressful for [Inskeeps], when [they] just want to enjoy [their] house where [they] live, [their] privacy, and . . . school events." Chelsea Inskeep testified that she "feel[s] uncomfortable every time [Moore] has come around" and that "every time [she] see[s] [Moore's] car parked in front of [Inskeeps'] house, it makes [her] feel sick to [her] stomach."

Moore and Walk assert that, "in his closing remarks, Joel Inskeep flatly stated that 'We don't care if [Moore and Walk] attend programs at the school.'" According to Moore and Walk, this purported "statement was not transcribed or was lost when the court reporter's computer malfunctioned and she lost 100 pages of the transcript and had to piece it back together." The court reporter in this case moved for an extension of time to file the transcript so that she could complete the last 100 pages of the transcript, which she lost when her computer malfunctioned. Based on alleged inaccuracies in the transcript, Moore and Walk request "clarification of the transcripts."

"If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and determined by the trial court and the record made to conform." Minn. R. Civ. App. P. 110.05. "We will not resolve a factual dispute about the accuracy of the transcript" where "[t]here is no indication that a motion to correct the record was made in the trial court." *Doty v. Doty*, 533 N.W.2d 72, 75 (Minn. App. 1995). Moore and Walk did not move to correct the alleged errors in the transcript before the district court, and we therefore deny their request to clarify the transcript on appeal.

Viewed in the light most favorable to the district court's judgment, the evidence in the record supports the court's findings. *See Rogers v. Moore*, 603 N.W.2d 650, 656 (Minn. 1999) ("[Appellate courts] view the record in the light most favorable to the judgment of the district court."). We conclude that the court's findings are not clearly erroneous. *See Fletcher*, 589 N.W.2d at 101 ("Findings of fact are clearly erroneous only if the reviewing

8

court is left with the definite and firm conviction that a mistake has been made." (quotation omitted)).

Finally, Moore and Walk contend in their pro se reply brief that "nothing that [they] did ever rose to the level of harassment required by Section 609.748." But beyond this general contention and citation to the harassment statute, Moore and Walk provide no additional authority or argument that the district court's factual findings do not support a finding of harassment. And prejudicial error is not obvious on mere inspection. We therefore do not consider this argument. *See Schoepke v. Alexander Smith & Sons Carpet Co.*, 290 Minn. 518, 519–20, 187 N.W.2d 133, 135 (1971) ("An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection.").

**Affirmed.**